# 26-0956-cv

# United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

WHEELY USA, INC., MAYFAIR-NY LLC, KENSINGTON-NY LLC,

*Plaintiffs-Appellants,*

– v. –

THE CITY OF NEW YORK,

*Defendant-Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

BORIS BERSHTEYN
ALEXANDER C. DRYLEWSKI
LARA A. FLATH
JACOB G. LEFKOWITZ
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
*Attorneys for Plaintiffs-Appellants*
One Manhattan West
New York, New York 10001
(212) 735-3000

COUNSEL PRESS
A ▷ Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (393484)

## CERTIFICATION PURSUANT TO F.R.A.P. 26.1

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellants Wheely USA, Inc., Mayfair-NY LLC, and Kensington-NY LLC state that:

Wheely USA, Inc. is wholly owned by Wheely Ltd. There is no publicly held corporation owning 10% or more of its stock.

Mayfair-NY LLC is wholly owned by Wheely USA, Inc., which is in turn wholly owned by Wheely Ltd. There is no publicly held corporation owning 10% or more of its stock.

Kensington-NY LLC is wholly owned by Wheely USA, Inc., which is in turn wholly owned by Wheely Ltd. There is no publicly held corporation owning 10% or more of its stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................6

ISSUES PRESENTED.......................................................................................6

STATEMENT OF THE CASE............................................................................7

    A.    Wheely is an FHV platform committed to user privacy ......................7

    B.    The TLC introduces records-retention regulations for FHVs...............8

    C.    The TLC adopts rules requiring FHVs to automatically disclose trip-level geolocation data on a monthly basis....................................9

    D.    Wheely seeks to operate FHV bases in New York.............................13

    E.    Proceedings below.........................................................................14

        1.    Plaintiffs' Action ........................................................14

        2.    District Court Proceedings...........................................16

        3.    The District Court's Order ..........................................17

        4.    Wheely's motion for administrative stay, injunction, and expedited appeal................................................................19

STANDARD OF REVIEW ..............................................................................19

SUMMARY OF ARGUMENT........................................................................20

ARGUMENT .................................................................................................22

I.    THE "CLOSELY REGULATED" INDUSTRY EXCEPTION DOES NOT APPLY TO FHVS LIKE WHEELY .....................................................22

    A.    The FHV Industry Is Not "Intrinsically Dangerous" .........................25

B.    Existing FHV Regulations Are Not A "Comprehensive Scheme"......................................................................................30

    1.    Many FHV regulations apply to all New York City businesses...........................................................................31

    2.    FHV-specific regulations are insufficient ...............................32

    3.    FHVs are distinct from taxicabs and high-volume FHVs ........34

C.    There Is No History Or Tradition Of Warrantless Seizures Of FHV Trip Data In New York City .......................................................38

D.    The Rules Are Unmatched ..................................................................40

II.    THE RULES ARE UNREASONABLE...........................................................41

A.    The Rules Do Not Constitute A Reasonable Inspection Regime For A Closely Regulated Industry .......................................................41

B.    The Rules Are Not A Reasonable Administrative Subpoena Scheme ...............................................................................................46

III.    THE RULES DO NOT ALLOW PRECOMPLIANCE REVIEW ...............48

IV.    THE RULES INDEPENDENTLY VIOLATE ARTICLE I, § 12 OF THE NEW YORK CONSTITUTION.......................................................54

V.    PLAINTIFFS HAVE SATISFIED THE OTHER INJUNCTION FACTORS......................................................................................................58

CONCLUSION....................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*5 Borough Pawn, LLC v. City of New York*,
640 F. Supp. 2d 268 (S.D.N.Y. 2009) ..........................................54

*ACLU v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) ........................................................59

*Airbnb, Inc. v. City of New York*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ....................................*passim*

*Allen v. Koenigsmann*,
700 F. Supp. 3d 110 (S.D.N.Y. 2023), *aff'd sub nom. Daniels v. Moores*, Nos. 24-30-pr; 24-785-pr, 2025 WL 883035 (2d Cir. Mar. 21, 2025) ......................................................................................58

*Anobile v. Pelligrino*,
303 F.3d 107 (2d Cir. 2002) ............................................42, 43, 57

*Arizona v. Gant*,
556 U.S. 332 (2009) ...................................................................43

*Big Ridge, Inc. v. Federal Mine Safety & Health Review Commission*,
715 F.3d 631 (7th Cir. 2013) .....................................................46

*Bodin v. City of New Orleans*,
804 F. Supp. 3d 669 (E.D. La. 2025), *appeal filed*, No. 25-30524 (Sept. 17, 2025) ......................................................................49

*Buliga v. New York City Taxi & Limousine Commission*,
No. 07 Civ. 6507(DLC), 2007 WL 4547738 (S.D.N.Y. Dec. 21, 2007), *aff'd*, 324 F. App'x 82 (2d Cir. 2009) ....................................37

*Camara v. Municipal Court of City & County of San Francisco*,
387 U.S. 523 (1967) ...................................................................22

*Carpenter v. United States*,
585 U.S. 296 (2018) ................................................................2, 38

iv

*Checker Cab Operators, Inc. v. Miami-Dade County*,
   899 F.3d 908 (11th Cir. 2018)................................................................36

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015)................................................................*passim*

*Club Madonna Inc. v. City of Miami Beach*,
   42 F.4th 1231 (11th Cir. 2022)..............................................................28

*Colonnade Catering Corp. v. United States*,
   397 U.S. 72 (1970)................................................................................39

*Donovan v. Lone Steer*,
   464 U.S. 408 (1984)..............................................................................47

*Donovan v. Dewey*,
   452 U.S. 594 (1981)..............................................................................44

*El-Nahal v. Yassky*,
   993 F. Supp. 2d 460 (S.D.N.Y. 2014), *aff'd*, 835 F.3d 248 (2d Cir.
   2016) ....................................................................................................35

*ESI/Employee Solutions, L.P. v. City of Dallas*,
   450 F. Supp. 3d 700 (E.D. Tex. 2020) ..................................................49

*Free Speech Coalition, Inc. v. Attorney General*,
   825 F.3d 149 (3d Cir. 2016)..................................................................25

*Gem Financial Service, Inc. v. City of New York*,
   No. 13-CV-1686 (RPK) (RER), 2023 WL 4850523 (E.D.N.Y. July 28,
   2023) ....................................................................................................58

*Hudson Shore Associates Ltd. Partnership v. New York*,
   139 F.4th 99 (2d Cir. 2025)................................................*passim*

*Illinois Transportation Trade Ass'n v. City of Chicago*,
   839 F.3d 594 (7th Cir. 2016)................................................................36

*Johnson v. Smith*,
   104 F.4th 153 (10th Cir. 2024)........................................25, 31, 33, 39, 40

*Liberty Coins LLC v. Goodman*,
   880 F.3d 274 (6th Cir. 2018)....................................................39, 43, 45

*Marshall v. Barlow's, Inc.*,
    436 U.S. 307 (1978)................................................................22, 24

*Martinez 2001 v. New York City Campaign Finance Board*,
    36 A.D.3d 544 (1st Dep't 2007).....................................................50

*Mexican Gulf Fishing Co. v. United States Department of Commerce*,
    60 F.4th 956 (5th Cir. 2023)............................................27, 28, 34

*New York Progress & Protection PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013).........................................................59

*New York v. Burger*,
    482 U.S. 691 (1987)..............................................................*passim*

*Newark Cab Ass'n v. City of Newark*,
    901 F.3d 146 (3d Cir. 2018)..........................................................36

*N.W. Airlines, Inc. v. Minnesota*,
    322 U.S. 292 (1944).......................................................................6

*Ognibene v. Parkes*,
    671 F.3d 174 (2d Cir. 2012)..........................................................58

*Owner-Operator Independent Drivers Ass'n v. U.S. Department of*
    *Transportation*,
    840 F.3d 879 (7th Cir. 2016).....................................28, 29, 40, 45

*People v. Commons West, LLC*,
    254 N.Y.S.3d 276 (3d Dep't 2026)......................................5, 52, 53

*People v. Scott*,
    79 N.Y.2d 474 (1992) ............................................................55, 56

*Progressive Credit Union v. City of New York*
    889 F.3d 40 (2018)........................................................................35

*See v. City of Seattle*,
    387 U.S. 541 (1967)...............................................7, 21, 22, 46

*Spirit Aerosystems, Inc. v. Paxton*,
    142 F.4th 278 (5th Cir. 2025).......................................................49

*Springfield Hospital, Inc. v. Guzman,*
    28 F.4th 403 (2d Cir. 2022)............................................................................20

*Statharos v. N.Y.C. Taxi & Limousine Commission,*
    198 F.3d 317 (2d Cir. 1999)............................................................................35

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025)............................................................................................5

*United States v. Biswell,*
    406 U.S. 311 (1972)........................................................................................44

*United States v. Jones,*
    565 U.S. 400 (2012)..........................................................................................6

*United States v. Moran Vargas,*
    376 F.3d 112 (2d Cir. 2004)............................................................................26

*Zadeh v. Robinson,*
    928 F.3d 457 (5th Cir. 2019)..............................................................25, 32, 40

**STATUTES**

28 U.S.C. § 1291 ....................................................................................................6

28 U.S.C. § 1331 ....................................................................................................6

28 U.S.C. § 1367 ....................................................................................................6

42 U.S.C. § 1983 ....................................................................................................6

N.Y. Admin. Code § 20-105....................................................................................32

N.Y. Admin. Code § 20-306(b) ..............................................................................32

N.Y. Admin. Code § 20-412(2) ..............................................................................32

N.Y. Admin. Code § 20-541....................................................................................31

N.Y. Admin. Code § 20-532(a) ..............................................................................32

N.Y. Crim. Proc. Law § 160.50..............................................................................56

N.Y. Crim. Proc. Law § 160.55..............................................................................56

Vehicle and Traffic Law § 415-a(5)(a)............................................55

**RULES**

6 R.C.N.Y. § 1-01(a) ...............................................................31

6 R.C.N.Y. § 1-06...................................................................31

15 R.C.N.Y. § 20 ...................................................................32

35 R.C.N.Y. § 58-03(g)............................................................35

35 R.C.N.Y. § 58-21(c)............................................................35

35 R.C.N.Y. § 58-26................................................................35

35 R.C.N.Y. § 59A-04..............................................................31

35 R.C.N.Y. § 59A-25(a) ..........................................................33

35 R.C.N.Y. § 59A-26(a) ..........................................................33

35 R.C.N.Y. § 59A-29(d) ..........................................................33

35 R.C.N.Y. § 59A-31..............................................................33

35 R.C.N.Y. § 59B-03 ..............................................................8

35 R.C.N.Y. § 59B-04(f) ..........................................................31

35 R.C.N.Y. § 59B-18(f) ..........................................................34

35 R.C.N.Y. § 59B-19 ....................................................11, 13, 52

35 R.C.N.Y. § 59D ..................................................................8

35 R.C.N.Y. § 59D-05(e) ..........................................................36

35 R.C.N.Y. § 67-04-05 ...........................................................35

35 R.C.N.Y. § 67-06(a) ...........................................................35

35 R.C.N.Y. § 67-07...............................................................35

35 R.C.N.Y. § 67-09-15 ...........................................................35

35 R.C.N.Y. § 80-14(f)..................................................................................29, 30

35 R.C.N.Y. § 80-17(c). ......................................................................................35

**OTHER AUTHORITIES**

*FHV – High Volume: Utilization Rate*, TLC Factbook, https://app.powerbigov.us/view?r=eyJrIjoiYTYwODgwNDMtYWQz NC00OGQxLTg2ZGYtMTcwZmE2OWU1NTJhIiwidCI6IjMyZjU2Z mM3LTVmODEtNGUyMi1hOTViLTE1ZGE2NjUxM2JlZiJ9 (last visited June 24, 2026). ...................................................................................30

Lawrence Van Gelder, *Medallion Limits Stem From the 30's*, N.Y. Times (May 11, 1996), https://www.nytimes.com/1996/05/11/nyregion/medallion-limits-stem-from-the-30-s.html. ......................................................................8

*Taxi & Limousine Comm'n v. Weiter LLC*., OATH Summons No. FC0000332 (Jan. 6, 2015), https://www.nyc.gov/assets/oath/downloads/pdf/WeiterNoDecFC0000 332.pdf; Jack Linshi, *All But 1 of Uber's NYC Bases Suspended After Failing to Supply Trip Data*, Time (Jan. 6, 2015), https://time.com/3656937/nyc-suspends-uber-bases/...................................51

**INTRODUCTION**

This appeal presents important and far-reaching questions of law about whether a New York City agency may compel for-hire vehicle ("FHV") companies to regularly surrender vast quantities of their detailed, sensitive trip records for every passenger they carry—without a subpoena, without suspicion, and without any opportunity for precompliance review before a neutral decisionmaker.[1] Appellant Wheely USA, Inc. (together with dispatching bases Mayfair-NY LLC and Kensington-NY LLC, "Wheely") connects passengers with FHV drivers through its technology platform. Wheely's users book pre-arranged trips by entering pickup and drop-off locations that typically include their homes and other sensitive locations. JA387. Wheely has built its business around a commitment to user privacy and data security. JA382-JA384.

Over the outcry of numerous community groups, drivers, academics, and others, the Taxi and Limousine Commission ("TLC") enacted unprecedented rules (the "Rules"), which require FHV companies to disclose a virtual replica of their internal trip databases every month, automatically and in perpetuity. JA20-JA27. Each monthly submission must include a ledger of *every* completed trip, identifying the driver and vehicle and recording the date, time, and location of every passenger

---

[1] As described on pp. 8-9 *infra*, for the purposes of this appeal, the term "FHV" refers only to black cars (like Wheely), limousines, and liveries. High-Volume For Hire Services ("HVFHS") like Uber are separately regulated.

pickup and drop-off to a precision of roughly *three feet*. JA25-JA27. The TLC has touted this regime as giving it insight into "the movement of millions of passengers a year" and a level of surveillance "unmatched by any other jurisdiction." JA22; JA52. Indeed, the TLC now maintains a database of millions of per-trip records.

The Rules pre-date a deepening public and judicial consensus that location data of the type at issue here is highly sensitive, and provides "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Carpenter v. United States*, 585 U.S. 296, 311 (2018). While the trip records at issue do not include passenger names, research studies found that even limited location data can be used to re-identify 95% of individuals, with one expert remarking that "D.N.A. . . . is probably the only thing that's harder to anonymize than precise geolocation information." JA12. Indeed, technological advances since the Rules' enactment allow anyone with an internet connection to synthesize vast quantities of location data, and to "de-anonymize" individual New York passengers and reveal their identities and movements, quickly and cheaply. JA1020-JA1026.

As a result, the City's regulatory overreach allows anyone with access to the TLC database—whether through a leak, a Freedom of Information Law ("FOIL") request, data sharing with other governmental agencies, or simply authorized use by TLC personnel—to reconstruct individual New Yorkers' movements, including to

2

their homes, schools, and workplaces; to courts, churches, synagogues, and mosques; and to political rallies, health clinics, and law offices. This flouts society's understanding of location data and the serious privacy risks it entails.

Given these concerns, Wheely challenged the Rules as unconstitutional under *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), which holds that administrative searches must provide an opportunity for precompliance review before a neutral decisionmaker. *Id.* at 419-22. By their automatic and recurring nature, the Rules do not and cannot provide the opportunity for such review before FHVs are forced either to comply with the mandate or incur penalties for noncompliance, including suspension and fines.

Nevertheless, the district court upheld the Rules and dismissed Wheely's complaint with prejudice, holding that (i) FHVs fall within the "closely regulated" industry exception to the rule that administrative searches must afford an opportunity for precompliance review; (ii) the Rules established a "reasonable" warrantless inspection regime for a "closely regulated" industry; and (iii) even if the FHV industry were not "closely regulated," the possibility that targets could bring a separate legal proceeding under Article 78 of the New York Civil Practice Law and Rules ("CPLR") satisfied the precompliance review mandated by *Patel*. Each of these novel holdings constituted legal error.

First, the Supreme Court has cautioned that the "closely regulated" industry exception is extremely narrow, and reserved for only a small handful of "intrinsically dangerous" industries subject to centuries-old traditions of warrantless inspection—not a label to be affixed to any business operating under a regulatory regime. *Patel*, 576 U.S. at 424-25, 424 n.5. The FHV industry is not "intrinsically"—or even demonstrably—dangerous; the regulations covering FHVs are indistinguishable from those governing countless other licensed businesses in New York City; and FHV regulations are the recent product of regulatory overreach, not a "centuries-old tradition" putting FHV companies on notice that they would have to surrender their sensitive passenger trip records, automatically and in bulk. Under the district court's reasoning, virtually every business in New York City would forfeit its privacy rights—a result *Patel* expressly warned would "swallow the rule." *Id.* at 425.

Second, even if the FHV industry were "closely regulated," the City's warrantless search regime is unreasonable under *New York v. Burger*, 482 U.S. 691 (1987), which requires a "substantial government interest" and a showing that such inspections are "necessary to further the regulatory scheme." *Id.* at 702. The City's purported interest behind the Rules is combatting so-called "driver fatigue" and ensuring passenger safety. *See* JA373-JA379. But the City has never offered any evidence that fatigued driving is a problem in the FHV industry and the TLC has admitted it is not. Moreover, the actual data show that passenger complaints in the

4

FHV industry are a rarity. Even more critically, the Rules' dragnet-style mandate sweeps far broader than the TLC's "driver fatigue" rationale requires, demanding time-stamped, per-trip geolocation records that are wholly unnecessary to the City's purported goals. What might serve the City's interests in combating driver fatigue and ensuring passenger safety is data on *shift length* and *driver identifiers*—not precise location coordinates for every individual passenger pickup and drop-off.

Third, the Rules afford no opportunity for precompliance review because Article 78 relief is unavailable until after an FHV company has refused to comply, been cited for a violation, exhausted its administrative remedies, and—given the quickly recurring nature of the demands and immediate imposition of penalties— already incurred mounting fines. The Fourth Amendment requires an opportunity for *pre*compliance review—i.e., before the subject of the search is "forced to choose between handing over their [property] or facing a penalty." *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 111 (2d Cir. 2025). Article 78 does not provide that opportunity given the nature of these Rules, and thus is a "toothless" remedy in these circumstances, as one New York appellate court recently recognized. *See People v. Commons W., LLC*, 254 N.Y.S.3d 276, 283 (3d Dep't Mar. 5, 2026).

"This case, like others involving modern data technologies, arises in a 'challenging new context' that counsels judicial caution." *TikTok Inc. v. Garland*, 604 U.S. 56, 62-63 (2025). Thus, "[i]n applying established legal principles to

'totally new problems,' courts should take care not to 'embarrass the future.'" *N.W. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944). By forcing Plaintiffs to divulge their sensitive passenger location data every month, in bulk and without even the minimum of constitutionally-mandated protections, the Rules thus violate the U.S. and New York constitutions. *See United States v. Jones*, 565 U.S. 400, 417 (2012) (Fourth Amendment issues should continually be reconsidered in light of changing privacy expectations in "the digital age") (Sotomayor, J., concurring). This Court should reverse the district court's order and remand with instructions to enter judgment in Plaintiffs' favor.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 28 U.S.C. § 1367.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Plaintiffs filed a timely notice of appeal of Judge Colleen McMahon's Opinion and Order on April 13, 2026.

## ISSUES PRESENTED

1.      Whether the district court erred in holding that the FHV industry falls within the "closely regulated" exception to the requirements of the Fourth Amendment under *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), and related exception to the requirements of Article I, § 12 of the New York Constitution.

6

2.      Whether the district court erred in holding that the TLC's warrantless collection of trip-level data is reasonable, including whether the Rules are "necessary" to achieve a  "substantial government interest" such that the Rules satisfy the requirements for warrantless administrative searches under *New York v. Burger*, 482 U.S. 691 (1987), and whether the Rules are "limited in scope" and "relevant in purpose" to satisfy the requirements for administrative subpoena schemes under *See v. City of Seattle*, 387 U.S. 541 (1967).

3.      Whether the district court erred in holding that the ability to file a separate lawsuit under Article 78 of the New York Civil Practice Law and Rules satisfies *Patel*'s requirement that the subject of an administrative search have the opportunity for review before a neutral decisionmaker before compliance is required.

## STATEMENT OF THE CASE

### A.      Wheely is an FHV platform committed to user privacy

Founded in 2010, Wheely is an FHV technology platform that connects users with highly skilled drivers. JA382. Users book pre-arranged trips through Wheely's app by entering their pickup and drop-off locations, which typically include users' homes. JA387.

In New York City, there are four classes of non-taxicab vehicle service for passengers seeking to pre-arrange trips: black cars, liveries, luxury limousines, and

7

high-volume for-hire services ("HVFHS"). Although HVFHS, like Uber, are technically considered a type of for-hire vehicle, they are subject to a separate licensing and regulatory scheme, including separate trip reporting obligations, under 35 R.C.N.Y. § 59D. Black cars, liveries, and luxury limousines, which are similarly situated for purposes of this appeal, are licensed pursuant to 35 R.C.N.Y. § 59B and are collectively referred to herein as "for-hire vehicles" or "FHVs." Each vehicle "base" (i.e., the operator through which FHVs are dispatched) must be licensed with the TLC. 35 R.C.N.Y. § 59B-03. Wheely is a black car FHV base.

From its inception, Wheely has been committed to user privacy and data security. JA383-JA384. To that end, all drivers on its platform sign non-disclosure agreements and attend a three-day program on service, safety, privacy, and discretion. JA383. Before this action, Wheely operated in London, Paris, and Dubai. JA382.

## B. The TLC introduces records-retention regulations for FHVs

In 1997, the TLC first introduced records-related regulations for the FHV industry. *See* JA527-JA528. New York City taxicabs, by contrast, have been regulated since 1937, when Mayor La Guardia signed the Haas Act to introduce the license and medallion system.[2] Under these FHV regulations, until 2014, FHV bases

---

[2] Lawrence Van Gelder, *Medallion Limits Stem From the 30's*, N.Y. Times (May 11, 1996), https://www.nytimes.com/1996/05/11/nyregion/medallion-limits-stem-from-the-30-s.html.

were required to "safeguard[] and maintain[]" records of the "date, the time, and location of the passenger to be picked up, the driver's for-hire operator's permit, and the permit number of the for-hire vehicle." JA527-JA528. These records were to be kept for six months and could be inspected by TLC representatives "during regular business hours." *Id.*

## C. The TLC adopts rules requiring FHVs to automatically disclose trip-level geolocation data on a monthly basis

In 2014, the TLC adopted new rules requiring FHVs to report "[t]he date, the time, and the location of the Passenger to be picked up" at a "frequency prescribed by the [TLC]." JA551. The TLC justified the new reporting requirement as necessary to identify FHV drivers so that it could (i) "enforce its rules against drivers across service types," (ii) issue summonses to drivers involved in crashes or the subject of passenger complaints, and (iii) ensure passengers could "get [rides] safely and reliably." JA531-JA532. The TLC did not explain why location data was necessary to accomplish those objectives, except to say that "[r]eceiving uniform trip records in regularly scheduled intervals" would help the agency "develop informed policies" and "understand where trips occur." JA532.

When these new rules were announced, numerous community groups, academics, and others voiced concerns about the "consolidation of vast amounts of information about the private trip records of millions of passengers." *See, e.g.*, JA52-JA53. Many objected to the collection of location data specifically, arguing that it

9

was irrelevant to the TLC's stated purpose of identifying FHV drivers. *See, e.g.*, JA70. Even so, the rules were adopted in 2014, giving the City insight into "the movement of millions of passengers a year," which the TLC touted was "unmatched by any other jurisdiction." JA22; JA52.

The TLC expanded the rules again in 2017 with the "fatigued driving" amendments, which proposed setting hourly limits for FHV drivers to combat fatigued driving. The TLC did not develop a record showing that fatigued driving was a demonstrated problem in the FHV industry. Instead, it relied on general risks associated with being awake for 18 hours and the testimony of a representative of the National Highway Traffic Safety Administration, who provided statistics on the impact of drowsy driving nationwide. JA162-JA165; JA373. No expert or speaker testified that fatigued driving was a problem in the FHV industry generally, or in the New York City FHV industry specifically. In fact, as multiple speakers pointed out, the TLC's own Statement of Basis and Purpose of Rules conceded that "almost all TLC licensed drivers do not drive an excessive number of hours." JA373.

The TLC proposed using FHV trip data to monitor driver compliance with the hourly limits. Under the 2014 version of the rules, FHV bases were required to submit only pickup-related trip data. The TLC concluded that a comparison of pickup and drop-off times would allow the TLC to calculate trip durations, which, according to the agency, "provides a more accurate way to identify drivers at risk of

10

fatigue." *Id.* The TLC therefore proposed, as part of the "fatigued driving" amendments, to expand the trip-reporting requirement to include drop-off data. While only drop-off times were needed to calculate trip durations under the TLC's own reasoning, the agency stated that drop-off location information could be used to "confirm the accuracy of the [FHV] records," help "investigat[e] passenger complaints," and "support street enforcement." JA375.

Once again, numerous community groups and others warned that the rules would provide the TLC "with a comprehensive view of the movements of individual New Yorkers." JA55. Then-Public Advocate Letitia James cautioned that the rules "could compromise New Yorkers' privacy without any proof that such regulations will increase overall safety." (Legal Aid Soc'y Amicus Br., Dist. Ct. Dkt. No. 31, at 2.) Despite these objections, the TLC adopted the "fatigued driving" amendments, including the expanded trip reporting requirements, and they went into effect in March 2017.

The current Rules are codified in 35 R.C.N.Y. § 59B-19. They require every FHV base to transmit the following records to the TLC, on a monthly basis in perpetuity, with respect to all dispatched trips:

(a) The date, the time, and the location of the Passenger pickup and drop-off;

(b) The Driver's TLC Driver License number;

(c) The dispatched Vehicle's License number;

(d)     The TLC License number of the For-Hire Base that dispatched the Vehicle;

(e)     The TLC License number of the For-Hire Base affiliated to the dispatched Vehicle;

(f)     Whether the Passenger is sharing the Vehicle for part or all of the trip with a Passenger from another dispatched call; and

(g)     Where applicable, an indication that the trip concluded in a cancellation by the Passenger or Driver.

On April 18, 2017, the TLC published a "Frequently Asked Questions" page on its website, which clarified the type of location data that FHV bases must provide: "Bases must provide the location of the pickup and dropoff and can do so using either an address, intersection, or airport, or the corresponding latitude/longitude for those locations. If [bases] provide an address, intersection, or airport, then [bases] do not have to provide latitude/longitude." JA26. As the TLC explained: "You should use the specific address or intersection where the passenger was picked up/dropped off, for instance W 33 St. and 8 Ave., Manhattan. You may also use latitude and longitude of the location instead of exact address or intersection, if you prefer." *Id.*

In an accompanying "Instruction Manual" on the TLC's website, the TLC explained how bases should input pickup and drop-off locations. In reporting "[t]he type of pickup address," the manual instructs: "Enter 'Exact Address' if the address is a full street address, enter 'Intersection of' if the address is an intersection, and enter 'Airport' if the address is an airport." *Id.* To report the "pickup location name,"

12

bases must provide "the street address where the pickup occurred" *i.e.*, "the location the customer gave the dispatcher when making the reservation. This field should include the building number, street name, city, state abbreviation, and ZIP code." *Id.* The Instruction Manual also explains that if a base provides latitude and longitude coordinates, the information submitted must be where the pickup or drop-off occurred "using the WGS 1984 coordinate system with a minimum of 5 decimal places." JA26-JA27. Using latitude and longitude coordinates to five decimal places correlates to a precision of three feet—or approximately the width of a doorway. *Id.*

Thus, to comply with the location data requirement, FHV bases must submit the following for *every* passenger pickup and drop-off performed: either (i) precise latitude/longitude coordinates (with a minimum of 5 decimal places); (ii) an exact address; or (iii) if the pickup or drop-off takes place at a street intersection or airport, the name of the intersection or airport.

Failure to comply with 35 R.C.N.Y. § 59B-19 can result in significant penalties. Submitting untimely, incomplete, or inaccurate trip records can lead to license suspension and fines between $100 and $500 for each violation instance.

## D. Wheely seeks to operate FHV bases in New York

The TLC granted Wheely's black car base license for Mayfair-NY in November 2025 and for Kensington-NY in February 2026. JA385; JA412; JA414. Wheely began operating in New York through Mayfair-NY in March 2026. JA503.

13

To prepare for operations, Wheely implemented a privacy policy for New York riders. Under the policy, Wheely will *process* user location data to provide transport services and comply with record-retention obligations; but Wheely will *share* user location data only "in response to court-issued orders or warrants." JA398-JA401. Even then, Wheely historically challenges overly broad requests and regulatory disclosure requirements that infringe on its passengers' fundamental rights and freedoms. JA384.

### E.    Proceedings below

#### 1.    Plaintiffs' Action

On February 6, 2026, Plaintiffs filed their complaint alleging, *inter alia*, that the Rules violate the Fourth Amendment and Article I, § 12 of the N.Y. Constitution. *See* JA36-JA39. Plaintiffs alleged the Rules were unconstitutional because they authorized a sweeping administrative search of their records without opportunity for precompliance review. *Id.* In support, Plaintiffs submitted declarations from Wheely's founder describing Wheely's strong interest in safeguarding sensitive user data. JA382-JA389; JA1015-JA1016.

Plaintiffs also submitted two declarations from Professor Neil Richards, a leading expert in the field of information privacy, who explained how the geolocation data mandated by the Rules can be used to easily identify individual passengers and reconstruct their movements, including where they live, work,

14

socialize, and engage in sensitive activities. JA427-JA446; JA1020-JA1026. Professor Richards detailed past instances where the TLC released geolocation data pursuant to New York's Freedom of Information Law ("FOIL") and how internet users were able to quickly "de-anonymize" passengers by cross-referencing public information. JA441-JA443. As Professor Richards explained, these risks have become more pronounced in recent years as technological advances and techniques have become easier to perform, including with Artificial Intelligence. JA444-JA446; JA1021-JA1025.

Through amicus curiae briefs, The Legal Aid Society and Surveillance Technology Oversight Project ("STOP") echoed those concerns. The Legal Aid Society warned that trip data can be used to identify and track members of targeted groups and individuals visiting sensitive locations, such as political rallies, health clinics, or houses of worship. (Dist. Ct. Dkt. No. 31.) STOP highlighted the TLC's integration with the NYPD's Domain Awareness System, which combines numerous surveillance technologies into a single searchable platform. (Dist. Ct. Dkt. No. 32.) Both organizations urged the district court to invalidate the Rules as unconstitutional.

Finally, Plaintiffs submitted evidence that, since 2015, the TLC received nearly 8,000 FOIL requests for location data under the Rules, and disclosed or partially disclosed data in response to *all of them*. JA365-JA366. The TLC also

15

admitted that it had disclosed trip data to other government authorities on 42 separate occasions, 13 times without a subpoena or warrant. JA366.

### 2. District Court Proceedings

On February 13, 2026, the district court merged Plaintiffs' requests for a preliminary injunction and permanent injunction, and scheduled a hearing for April 20. JA490-JA492.

During expedited discovery, Plaintiffs served interrogatories requesting that the City identify each instance in which the TLC complied or refused to comply with a request from a governmental entity for the records submitted pursuant to the Rules, including (i) the date of such request, (ii) the entity serving the request, (iii) the nature of the request, (iv) the TLC's response to the request, and (v) a description of the data provided pursuant to the request. JA515-JA516. The City refused to answer these interrogatories and raised the discovery dispute to the district court on March 11, 2026. JA493-JA497.

On March 23, 2026, while the discovery dispute was still pending, the City opposed Plaintiffs' motion for a permanent injunction, arguing that Plaintiffs had no expectation of privacy in their records because the industry in which Wheely operated qualified as "closely regulated." (Dist. Ct. Dkt. No. 33.)

The City included a declaration from the TLC's FOIL officer, Latifa Williams, who asserted that pursuant to an unidentified "TLC policy," during her time at the

TLC beginning in November 2021, she did not provide precise passenger geolocation data when such records were requested under FOIL. JA1013-JA1014. Ms. Williams did not address the evidence that the TLC has disclosed trip data to other government authorities on 42 separate occasions, 13 of which occurred without any subpoena or warrant. *See* JA366.

On April 1, 2026, Plaintiffs submitted their reply brief in further support of their motion for a permanent injunction. (Dist. Ct. Dkt. No. 41.) In addition to their legal arguments, Plaintiffs disputed the relevance of the Williams Declaration, particularly because the referenced "TLC Policy"—which Plaintiffs later obtained— does not, in fact, prohibit disclosure of precise geolocation data to the public. CA2-CA4. It only requires FOIL officers to redact pickup and drop-off location information when "identifying information is given (or received) about the driver and/or vehicle." CA2. The Williams Declaration was also contradicted by multiple instances where the TLC had published geolocation data under FOIL. *See* JA31-JA33.

The next day, the district court granted Plaintiffs' motion to compel, ordering that the City answer the interrogatories relating to the disclosure of trip data to Government Entities. JA1029-JA1033.

### 3. The District Court's Order

17

On April 10, 2026, the district court denied Plaintiffs' motion for a permanent injunction and dismissed the complaint with prejudice. SPA61. As a result, the district court mooted its order compelling the City to answer certain interrogatories, with which the City had not yet complied.

As relevant here, the district court agreed "that Plaintiffs have a cognizable interest in the confidentiality of their trip data," and "[t]hat is sufficient to conclude that the challenged rules implicate the Fourth Amendment." SPA32. Nevertheless, the district court held that Plaintiffs had no expectation of privacy in their business records because the FHV industry, as a whole, qualifies as "closely regulated." SPA26-SPA31. In support of this classification, the district court cited the scope and age of the Rules and other district court cases holding that drivers and passengers in the separate taxicab industry had diminished expectations of privacy in their whereabouts on public roadways. *Id.*

The district court further held that the Rules satisfy *Burger*'s test for constitutionally reasonable administrative inspection regimes in "closely regulated" industries. SPA35-SPA39. For this holding, the district court concluded that the Rules were necessary to further the City's "substantial interest" in "passenger safety, driver accountability, and consumer protection." *Id*.

Finally, the district court held that, even if the FHV industry were not "closely regulated," the Rules would still be constitutional because FHV bases like Wheely

18

have the opportunity for precompliance review because they can commence a separate legal proceeding under Article 78 of the New York Civil Practice Law and Rules. SPA40-SPA43.

On April 13, 2026, Plaintiffs filed a notice of appeal and moved for a stay of enforcement of the Rules pending appeal (JA1105-JA1108), which the district court denied. JA1109-JA1110.

### 4. Wheely's motion for administrative stay, injunction, and expedited appeal

Plaintiffs filed their notice of appeal on April 13, 2026, and also moved for (1) an injunction against enforcement of the Rules pending the appeal, (2) an administrative stay of the Rules pending a ruling on the injunction request, and (3) an expedited appeal schedule. The City opposed the first two requests and did not oppose the third.

On April 23, 2026, this Court (Merriam, J.) granted the request for an administrative stay. (ECF 22.) On May 28, a motion panel declined to enter an injunction, reasoning that "judicial intervention that has been withheld by lower courts" is a "drastic" remedy that must meet a "very high standard." (ECF 27 at 2.) It granted Plaintiffs an expedited appeal schedule. (*Id.*)

### STANDARD OF REVIEW

The district court's conclusions of law are subject to *de novo* review while its ultimate decision to grant or deny a permanent injunction is reviewed for abuse

19

of discretion. *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 415 (2d Cir. 2022). Here, Wheely challenges several of the district court's conclusions of law as erroneous, each of which is subject to *de novo* review.

## SUMMARY OF ARGUMENT

The district court denied Wheely's constitutional challenge on the grounds that the FHV industry is "closely regulated" and because the TLC's Rules constitute a reasonable, warrantless inspection regime under the Fourth Amendment. The district court also held that even if the FHV industry were not "closely regulated," the Rules are still reasonable because the availability of Article 78 under New York law supplies the opportunity for precompliance review required by *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). The district court's holdings were legal error, its judgment should be reversed, and the case should be remanded with instructions to enter judgment in Plaintiffs' favor.

First, the district court erred in holding that the FHV industry falls within the "closely regulated" industry exception. The FHV industry lacks all of the characteristics *Patel* identified as essential to this extremely narrow exception. The FHV industry is not "intrinsically dangerous"; regulations governing the FHV industry are neither "comprehensive" nor distinguishable from those applicable to other licensed businesses in the City; and the FHV industry does not have a "centuries-old" tradition of warrantless searches.

20

Second, the district court erred in holding that the Rules are a reasonable inspection regime for a "closely regulated" industry under *New York v. Burger*, 482 U.S. 691 (1987). The City has not provided any support for its interest in combatting driver fatigue or passenger safety issues, and the Rules are not "necessary to further" those purported interests because there is no connection between location data and the City's ability to monitor excessive driving hours and identify drivers involved in safety-related incidents. The City also has no need for recurring, warrantless, and suspicionless access to every FHV base's bulk, trip-level data in order to advance its general safety and compliance interests.

Third, the district court failed to address that the Rules are also not a reasonable administrative subpoena scheme for a "closely regulated" industry under *See v. City of Seattle*, 387 U.S. 541 (1967). The Rules are not "limited in scope" because they demand broad categories of data for every passenger trip. *Id.* at 544. Nor are they "relevant in purpose" because the City's general safety and compliance rationales are insufficient to justify the Rules' sweeping and recurring demand for time-stamped, trip-level records. *Id.*

Fourth, the district court erred in holding that Article 78 provides FHV companies an opportunity for precompliance review under *Patel*. Article 78 cannot satisfy *Patel* because FHV companies cannot initiate an Article 78 proceeding until after they have made a "compliance decision," exhausted administrative remedies,

21

and—given the recurring nature of the Rules' demands and the immediate imposition of penalties—incurred suspensions or fines.

## ARGUMENT

### I. THE "CLOSELY REGULATED" INDUSTRY EXCEPTION DOES NOT APPLY TO FHVS LIKE WHEELY

Administrative inspections are "significant intrusions upon the interests protected by the Fourth Amendment." *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 534 (1967). This principle applies equally in the commercial context, where the business owner "has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *City of Seattle*, 387 U.S. at 543. For an administrative search to be constitutional, it must be reasonable and afford the subject "an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420.

The "closely regulated" industry doctrine is "a narrow exception" to the rule that administrative searches must provide an opportunity for precompliance review. *Id.* at 424; *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("The clear import of our cases is that the closely regulated industry . . . is the exception."). No warrant or opportunity for precompliance review is required in these select industries because they have "such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Barlow's, Inc.*, 436 U.S. at 313.

22

The Supreme Court has only ever classified four industries as falling within the "closely regulated" exception—liquor, firearms, mining, and junkyards. In *Patel*, the Court compared the hotel industry to these four industries and held that "hotels should [not] be counted among them" for three reasons. 576 U.S. at 424.

First, "[u]nlike liquor sales, firearms dealing, mining, or running an automobile junkyard," there was nothing inherent in the operation of hotels that "poses a clear and significant risk to the public welfare." *Id.* at 424. To be sure, hotels could be used for "nefarious ends"; but, as the Supreme Court explained, that is true of "practically all commercial premises or services." *Id.* at 424 n.5. By contrast, the industries the Court had found to be closely regulated were "*intrinsically* dangerous." *Id.*

Second, simply because the hotel industry was subject to close regulatory oversight did not render it "closely regulated" in the Fourth Amendment sense. Rather, the *Patel* Court held that there must be a "comprehensive scheme of regulation that distinguishes hotels from numerous other businesses." *Id.* at 425. Indeed, many hotel regulations applied to all businesses—i.e., maintaining a license, collecting taxes—and "[i]f such general regulations were sufficient to invoke the closely regulated industry exception, it would be hard to imagine a type of business that would not qualify." *Id.* Even the existence of hotel-specific regulations did not suffice to bring the hotel industry under the "closely regulated" exception because

23

they did not establish a "comprehensive scheme" that destroyed hotel owners' expectation of privacy in their records and put them "on notice that their property will be subject to periodic inspections." *Id.* (citing *Burger*, 482 U.S. at 705 n.16).

Finally, the history of hotel regulations did not reveal a "centuries-old tradition" of warrantless searches like the four industries deemed to fall within the "closely regulated" exception. *Id.* Although laws requiring innkeepers to provide suitable lodging dated back to 1893, those "are not the same as laws subjecting inns to warrantless searches." *Id.* at 426. By contrast, the Court emphasized, "warrantless inspection provisions for junk shops ha[d] been a part of the law of the City of New York and of Brooklyn for at least 140 years." *Burger*, 482 U.S. at 707.

In concluding that "many more businesses" may be considered "closely regulated," the district court expressly relied on the *dissent* in *Patel*. (SPA29.) But the *Patel* majority was far more restrictive. It emphasized that the "closely regulated" exception should seldom be applied—otherwise, it "would permit what has always been a narrow exception to swallow the rule." *Id.* at 424-25; *see also Barlow's*, 436 U.S. at 313 ("closely regulated" industries should be treated as "the exception" and warrantless searches of businesses permitted "as responses to relatively unique circumstances").

Since *Patel*, several Circuits have rejected efforts to classify additional industries as "closely regulated"—even those subject to close oversight and

24

involving safety risks. For example, the Fifth Circuit concluded that the medical profession did not fall within the "closely regulated" exception despite being "extensively regulated." *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019). Likewise, the Tenth Circuit ruled that the animal kennel industry was not "closely regulated" despite being subject to "detailed regulations" dating to 1991. *Johnson v. Smith*, 104 F.4th 153, 170 (10th Cir. 2024). And the Third Circuit held that the pornography industry was not "closely regulated," even though regulations of "sexually explicit images" had "been in place for some time." *Free Speech Coalition, Inc. v. Att'y General*, 825 F.3d 149, 169 (3d Cir. 2016).

Here, the district court erred in concluding that the FHV industry is "closely regulated." As demonstrated below, the FHV industry lacks the essential criteria *Patel* identified: FHVs, like hotels, are not "intrinsically dangerous"; regulations governing FHVs are no more comprehensive than those applicable to myriad other businesses in New York City; and FHV regulations are recent, not "centuries-old," and, until the Rules' first passage, did not put base owners on notice that location records would be routinely seized.

## A.     The FHV Industry Is Not "Intrinsically Dangerous"

The *Patel* Court treated innate "dangerousness" as a powerful limit on the "closely regulated" industry exception. It held that the hotel industry did not qualify because, "unlike liquor sales, firearms dealing, mining, or running an automobile

25

junkyard, nothing inherent in the operations of hotels poses a clear and significant risk to the public welfare." *Patel*, 576 U.S. at 424. The Court recognized that, although hotels could be used for "nefarious ends," this was true of "practically all commercial premises or services." *Id.* n.5. By contrast, the industries the Court found to be "closely regulated" were "*intrinsically* dangerous." *Id.* (emphasis added).

Here, the FHV industry, like the hotel industry in *Patel*—and unlike the four industries the Supreme Court has held fall within the closely regulated exception—is not "intrinsically dangerous." *Id.* The district court incorrectly reached the opposite conclusion by reasoning that "passengers entrust their physical safety to drivers they do not know, riding in vehicles they do not control, often traveling alone and at all hours, and frequently in circumstances where assistance is not readily available if something goes wrong." SPA29. But those safety concerns are equally present—if not greater—in hotels, where guests entrust their physical safety to innkeepers while sleeping defenselessly in private rooms. *See United States v. Moran Vargas*, 376 F.3d 112, 115 n.1 (2d Cir. 2004) ("A person staying in a motel room has the . . . constitutional protection against unreasonable searches of that room as someone in his or her own home."). Like hotels, and like "practically all commercial premises or services," FHVs can "be put to use for nefarious ends"—but that does not make them "intrinsically dangerous" so as to justify the surrender of constitutional privacy protections. *Patel*, 576 U.S. at 424 n.5.

26

The City's invocation of general statistics on drowsy driving falls well short of rendering the FHV industry "intrinsically dangerous." On this score, the Fifth Circuit's recent reasoning in *Mexican Gulf Fishing Co. v. United States Department of Commerce*, 60 F.4th 956 (5th Cir. 2023), is especially instructive. There, the court held that the charter-boat fishing industry was not sufficiently dangerous for the "closely regulated" exception to apply, even though the government relied on evidence that the fishing industry, if left unregulated, could deplete a critical food supply and thereby cause public harm. *Id.* at 970. The court rejected that evidence as too generalized because it addressed "the risk of the general fishing industry, instead of considering the risk of the particular charter-boat fishing industry." *Id.* And because charter-boat fishing "accounts for a small percentage of total fishing within the Gulf of Mexico," the Fifth Circuit concluded that the record did not support a finding that the charter-boat industry itself "would pose a threat to the public welfare if left unregulated." *Id.*

The same reasoning applies here. In enacting the Rules, the City merely relied on generalized, nationwide driving statistics regarding driver fatigue. (*Supra* p. 10.) They do not reveal anything about the FHV industry in particular, much less about New York City's FHV industry in which Wheely operates.

Nor can the City satisfy *Patel* by pointing to isolated risks associated with particular activities within the industry. The relevant question is whether the *industry*

27

*itself* poses a significant, inherent risk to the public—not whether certain activities within the industry can be put to "nefarious ends." 576 U.S. at 424 n.5. On that score, the City has offered no evidence that passenger safety issues are more prevalent in the FHV industry, and in fact, the data shows the opposite. In 2025, FHV drivers received only 0.68 complaints for every 100,000 trips—resulting in a minuscule 0.11 fines or hearings for every 100,000 trips performed (i.e., one fine or hearing for every *million* trips). JA1016. Taxicabs, by contrast, were subject to fines or hearings at a rate of 3.62 per 100,000 trips. *Id.* Again, as in *Mexican Gulf Fishing*, the relevant evidence here undermines any claim that the FHV industry poses a significant threat to public welfare "because it accounts for a small percentage" of safety-related complaints. *Mex. Gulf Fishing*, 60 F.4th at 970.

Although other circuits have extended the "closely regulated" exception to other industries following *Patel*, these decisions are either inconsistent with *Patel* or readily distinguishable because they were based on specific legislative findings that showed concrete risks to public welfare that are entirely absent here. *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 894 (7th Cir. 2016) (citing congressional records of dangerous trucking practices from 1935 to demonstrate that "Congress has long recognized commercial trucking as a dangerous industry"); *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1245 (11th Cir. 2022) (extending exception to adult entertainment industry based on findings of

28

its proximate relationship to "human trafficking," including evidence of "rampant" fake ID use).

The *Owner-Operator* decision, on which the City relied before the district court, illustrates the point. There, the Seventh Circuit's conclusion that the commercial trucking industry was "closely regulated" was grounded in Congress's extensive findings that the industry was inherently dangerous. Indeed, Congress had recognized it as a uniquely dangerous industry since 1935, when the term "truckathon" was coined to describe "the brutal, inhumane, and dangerous practice whereby drivers of busses and trucks are compelled to work 18 to 20 hours a day, to the detriment of their own health and the danger of the public who travel the highways of our country." *Owner-Operator*, 840 F.3d at 894-95 (quoting 79 Cong. Rec. 12,212 (1935)). As the Seventh Circuit reasoned, the operation of these massive rigs is "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id.* at 895.

No such findings have been made here with respect to FHV service, which is categorically different from commercial trucking. FHV operations do not involve multi-ton vehicles operating at highway speeds over long distances. In fact, it is virtually impossible for FHV drivers to violate the anti-fatigue rules. Those rules prohibit drivers from recording 10 hours of passenger time in any 24-hour period. 35 R.C.N.Y. § 80-14(f). Public data confirms that high-volume FHVs typically

29

operate at around 50% utilization (i.e., they have passengers in the vehicle approximately half the time)[3]; this would require drivers to drive continuously for over 20 hours of a 24-hour day (or even longer, as the rules allow an exemption to go over the 10-hour threshold if a trip begins below the threshold). 35 R.C.N.Y. § 80-14(f)(iv). And the result is even more stark for non-high volume FHVs like Wheely, which perform far fewer trips per day than high-volume FHVs, and thus have even lower utilization rates. It thus should come as no surprise that the TLC has admitted that "almost all TLC-licensed drivers *do not* drive an excessive number of hours." JA373 (emphasis added). Accordingly, the Rules are an overbroad solution in search of a problem.

**B.      Existing FHV Regulations Are Not A "Comprehensive Scheme"**

The City's existing regulations for FHVs are not a comprehensive scheme that puts participants on notice that they have no expectation of privacy in their sensitive, trip-level location records. *Patel*, 576 U.S. at 425 (citing *Burger*, 482 U.S. at 705 n.16). While the district court observed that the TLC regulates "entry, ownership, dispatch operations, driver relationships, financial accountability, and ongoing compliance" (SPA50), it is well-established that the "sheer quantity of pages of

---

[3] *FHV – High Volume: Utilization Rate*, TLC Factbook, https://app.powerbigov.us/view?r=eyJrIjoiYTYwODgwNDMtYWQzNC00OGQ xLTg2ZGYtMTcwZmE2OWU1NTJhIiwidCI6IjMyZjU2ZmM3LTVmODEtNG UyMi1hOTViLTE1ZGE2NjUxM2JlZiJ9 (last visited June 24, 2026).

statutory material is not dispositive." *Burger*, 482 U.S. at 705 n.16. Instead, what matters is whether the regulations "distinguish [FHVs] from numerous other businesses," and are so comprehensive as to inform base operators that they will be subject to unannounced warrantless inspections. *Id.*; *Johnson*, 104 F.4th at 170 (regulations must be "narrowly directed at a limited number of businesses" to find an industry closely regulated). As explained below, the regulations at issue do not.

### 1. Many FHV regulations apply to all New York City businesses

FHVs in New York City are subject to ordinary compliance rules that apply broadly to many, and in some cases all, businesses operating in the City. These include requirements to provide current contact information (35 R.C.N.Y. § 59A-04(n)), designate agents for service of process (*Id.* § 59A-04(d)), pay outstanding fines and fees (*Id.* § 59B-04(f)), and comply with "any other applicable laws" (SPA28 (quoting *Id.* § 59A-04(e)(6)))—all of which are standard conditions for doing business in New York. FHV bases must also comply with rules applicable to any business holding a license, such as filing corporate documents, *see, e.g.*, N.Y. Admin. Code § 20-541 (car washes), and posting and maintaining a bond, 6 R.C.N.Y. § 1-06 (any licensed business required to submit proof of bonding).

Fingerprinting and background checks are likewise routine licensing measures. The New York City Department of Consumer and Worker Protection ("DCWP") has general authority to fingerprint any license applicant (6 R.C.N.Y. §

31

1-01(a)) and exercises that authority across a range of industries, including locksmiths (N.Y. Admin. Code § 20-306(b)), booting companies (*Id.* § 20-532(a)), and electronic service dealers (*Id.* § 20-412(2)). And the fact that FHV base operators will face penalties for operating without a license is not unique, but rather a basic premise of all licensing schemes. *See* N.Y. Admin. Code § 20-105 (making it unlawful to engage in any trade or business without a license where a license is required).

In short, the City's FHV regulations do not establish a "comprehensive scheme" that meaningfully distinguishes the FHV industry from a multitude of other industries subject to licensing requirements. To hold otherwise would risk deeming "the entirety of American interstate commerce" closely regulated, thereby permitting "what has always been a narrow exception to swallow the rule." *Patel*, 576 U.S. at 424-25; *see also Zadeh*, 928 F.3d at 465 ("Satisfying the [closely regulated] doctrine requires more" than evidence that the industry is "extensively regulated and has licensure requirements."); *see also* 15 R.C.N.Y. § 20 (listing regulations governing dry cleaners including permits, detailed standards for operations, plumbing inspections, and enforcement authority). The Court should decline that invitation.

### 2. FHV-specific regulations are insufficient

The City's FHV-specific regulations also do not establish a "comprehensive regime" because they fail to "put FHVs on notice" that their sensitive business trip-

32

level geolocation records may be seized without a warrant. *Patel*, 576 U.S. at 425. Under *Patel*, whether an industry is "closely regulated" turns not only on the breadth and industry-specific focus of the regulatory regime, but also on "the extent to which the regulations necessarily require intrusion on privacy." *Johnson*, 104 F.4th 171; *see also Burger*, 482 U.S. at 701 (the closely-regulated-industry "doctrine is essentially defined by the pervasiveness and regularity of the federal regulation and the effect of such regulation upon an owner's expectation of privacy"). The hotel-specific regulations in *Patel*, for example, did not support a "closely regulated" finding because requirements that hotels change linens between guests did not put hotel owners on notice that they lacked any reasonable expectation of privacy in their records. *Patel*, 576 U.S. at 425.

The same is true for the hodgepodge of FHV-specific regulations in the administrative code. Many simply distinguish FHVs from taxicabs—for example, FHVs cannot be painted yellow or green, cannot equip roof lights or taximeters, and may operate through prearranged rides only. *See* 35 R.C.N.Y. §§ 59A-29(d), 59A-31(b), (c), 59A-25(a). Others impose ordinary (and unsurprising) vehicle operability standards, such as requirements that FHVs pass DMV safety and emissions inspections. *See Id.* § 59A-26(a). As in *Patel*, it can hardly be said that regulations governing vehicle markings and operability put FHVs "on notice" that their business records will be subject to warrantless seizure.

33

Nor can the City point to the rule requiring "Base Agreements," which the district court cited as evidence that the TLC regulates the "financial and contractual terms governing participation in a base's business." SPA27. The TLC does not dictate the precise terms for these agreements and need not even approve them when they are drafted by FHV bases. *See* 35 R.C.N.Y. § 59B-18(f).

### 3. FHVs are distinct from taxicabs and high-volume FHVs

In labeling the FHV industry "closely regulated," the district court relied on a handful of lower court cases permitting the collection of GPS data from taxicabs on a theory that the taxicab industry is "pervasively" or "heavily" regulated. But those cases, all of which pre-date *Patel*, are inapposite for multiple reasons.

First, FHVs and taxicabs do not belong to the same industry. "Because [the closely regulated industry] exception is narrow, federal courts must not define the industry at issue at too high a level of generality." *Mex. Gulf Fishing Co.*, 60 F.4th at 968. In *Mexican Gulf Fishing*, the Fifth Circuit defined the relevant industry as charter boat fishing, not general fishing, because federal statutes and regulations distinguished between them and "charter-boat fishing is more recreational than it is commercial in many respects." *Id.* at 969. The same principle applies here and compels the conclusion that the relevant industry is not the taxi industry.

Indeed, the TLC's own regulatory scheme confirms that distinction. That scheme includes entirely separate chapters governing taxis and FHVs. *Compare*

34

Chapter 58 (Medallion Taxicab Service) *with* Chapter 59 (For-Hire Service). Taxis have long been subject to unique regulations befitting their status as quasi-public utilities. *See, e.g.*, *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 324 (2d Cir. 1999) (observing that "taxis are an important part of the public life of the City and have a City-granted monopoly on providing a crucial service"); *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 467-68 (S.D.N.Y. 2014), *aff'd*, 835 F.3d 248 (2d Cir. 2016) (explaining that given their "openness to public use," taxis "are not truly private vehicles"). These regulations govern virtually every aspect of the taxi industry and include, for example: approved rates and fees (35 R.C.N.Y. § 58-26); must accept cash (*Id.* § 80-17(c)); must be painted a specific shade of yellow (*Id.* § 67-07); must be a certain vehicle make and model (*Id.* §§ 67-04-05); must be wheelchair accessible (*Id.* § 67-06(a)); subject to numerous equipment requirements (*Id.* §§ 67-09-15); must provide services on demand (*Id.* § 58-03(g)); only TLC-licensed agents may operate on behalf of medallion owner (*Id.* Chapter 63); and maximum charge to rent medallions (*Id.* § 58-21(c)).

FHVs and FHV bases are not subject to those regulations. They set their own fares, are privately owned, and compete for riders in a private market. They also operate differently—FHVs cannot accept street hails and require passengers to pre-arrange trips. Courts have repeatedly recognized that taxis and FHVs are materially different. *See Progressive Credit Union v. City of New York*, 889 F.3d 40, 50 (2d Cir.

35

2018) ("[T]here are enough differences between taxi service and [FHV] service to justify different regulatory schemes."); *Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 597-98 (7th Cir. 2016) (comparing taxis and FHVs to "cats" and "dogs" with different business models and regulatory treatments); *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (identifying "salient differences" including that taxis accept street hails while FHVs require prearrangement, taxis have government-set fares while FHVs do not, and taxi customers have no prior relationship with the driver); *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 923–24 (11th Cir. 2018) (holding that "distinct business models" justify "different regulatory schemes").[4]

The district court also failed to recognize that FHVs like Wheely are distinct from high-volume FHVs. Indeed, high-volume FHVs must comply with the same baseline rules applying to FHVs *plus* a dedicated subchapter of high-volume-specific rules with additional licensing, data-reporting, environmental, and operational requirements. *See* 35 R.C.N.Y. § 59D-05(e) ("High-Volume For-Hire Services must

---

[4] The district court acknowledged these cases but dismissed them as arising outside the Fourth Amendment context. SPA30-SPA31. That objection misses the point. These decisions are relevant not because they apply the closely-regulated-industry framework, but because they verify the factual premise on which the analysis here depends: that FHVs are subject to a materially lighter regulatory regime than taxis. Notably, every one of these cases was brought by taxi operators who argued that FHVs should be subjected to *more* regulation—and each time, the courts upheld the City's decision to impose lighter burdens on FHVs.

continue to meet all requirements of [] Subchapter 59B [FHV rules]"). These requirements have no counterpart in the rules governing FHVs like Wheely. The district court lumped FHVs together with high-volume FHVs without properly acknowledging these distinctions or grappling with the conclusion that, if the FHV industry is not even uniformly regulated, it cannot be comprehensively regulated under *Patel*.

Moreover, the distinctions in regulatory treatment and operations give rise to fundamentally different privacy expectations. Taxicab cases, therefore, cannot control whether the separate FHV industry is "closely regulated." To hold otherwise would collapse distinct regimes, flout the TLC's own classifications, and transform the "closely regulated" designation from a narrow exception to the broad rule. *See Mex. Gulf Fishing Co.*, 60 F.4th at 968 (warning that courts must not "define the industry at too high a level of generality" because the "exception is narrow").

Second, even assuming, *arguendo*, that the taxicab cases could be extended to FHVs, they do not support treating the FHV industry as "closely regulated" for purposes of the administrative search doctrine. Those decisions did not consider whether—much less hold that—that taxicab regulations rendered the taxicab industry "closely regulated." Rather, they concluded that taxicab *drivers* lack a reasonable expectation of privacy in their location data because they disclose their movements on public roads. *See Buliga v. New York City Taxi & Limousine Comm'n*,

37

No. 07 Civ. 6507 (DLC), 2007 WL 4547738, at *2 (S.D.N.Y. Dec. 21, 2007), *aff'd*, 324 F. App'x 82 (2d Cir. 2009). FHV bases are different: They do not expose their business records to the public or voluntarily disclose them to third parties in the manner relevant to the third-party doctrine. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 484 (S.D.N.Y. 2019) (home-sharing platforms "have privacy interests in their user-related records" even if their customers did not).

Finally, the Supreme Court has called into doubt the legal basis underpinning the taxicab cases. In *Carpenter*—decided after the Rules were enacted—the Court held that cell phone users had a privacy interest in their location data even if it was disclosed to wireless carriers. *Carpenter v. United States*, 585 U.S. 296 (2018). In doing so, the Court emphasized that location data provides a "detailed, encyclopedic, and effortlessly compiled" record of a person's movement, and that "seismic shifts in digital technology" expanded the scope and ease of location tracking. *Id.* at 297, 313. While *Carpenter* did not involve vehicle location, its emphasis on the perils of tracked location data strongly supports the notion that drivers and passengers have a reasonable expectation of privacy, even on public streets. That reasoning applies *a fortiori* here, where Wheely itself has an independent and compelling interest in the privacy of its sensitive passenger location records.

C. **There Is No History Or Tradition Of Warrantless Seizures Of FHV Trip Data In New York City**

FHV regulations do not rest on a "centuries-old tradition" of warrantless

38

searches, but rather on a recent history of regulatory creep. The earliest recordkeeping regulations applicable to FHVs were enacted in 1997. *See* JA527-JA528. "[W]arrantless inspection provisions for junk shops," by contrast, had been "part of the law of the City of New York . . . for at least 140 years." *Burger*, 482 U.S. at 707; *see also Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75 (1970) (warrantless inspections of liquor distilling dated to 1791); *Liberty Coins LLC v. Goodman*, 880 F.3d 274, 284 (6th Cir. 2018) (exception applied based on history of searches since 1863); *Johnson*, 104 F.4th at 170 (33-year history of warrantless searches "not entitled to particular weight when compared to the timeframes for industries that the Supreme Court has found closely regulated").

Nor do the 1997 rules supply the needed historical analog. Recordkeeping regulations are "not the same as laws subjecting [FHVs] to warrantless searches." *Patel*, 576 U.S. at 426. The 1997 rules required only that bases "safeguard[] and maintain[]" records of "the date, the time, and location of the passenger to be picked up." JA527-JA528. They did not require bases to record drop-off information, maintain records in any particular format, or transmit location records to the government. Rather, the 1997 rules required bases to keep the records on site for only six months and make them available for inspection by Commission representatives during regular business hours. *Id.*

It was not until 2017 that the Rules imposed a mandate on every FHV

39

operating in New York City to turn over to the TLC a replica of their entire pickup and drop-off history every month, month after month, in perpetuity. There simply is no historical analog for the type of broad, warrantless searches authorized by these Rules, let alone the kind of "centuries-old tradition" required by *Patel*.

### D. The Rules Are Unmatched

After *Patel*, some circuit courts have included an additional consideration to the "closely regulated" industry analysis: "whether other states have similar schemes" that would put participants "on notice" that their property is subject to unannounced warrantless inspections. *Zadeh*, 928 F.3d at 465-66; *see also Johnson*, 104 F.4th at 170-71. In *Johnson*, the Tenth Circuit conducted a survey of state laws to find jurisdictions with comparable warrantless search regimes in the boarding and training kennel industry. *See id.* at 171-73. Although the court identified 34 states with regulatory regimes targeting pet-animal businesses, it found that "unannounced warrantless inspection" regimes appeared in only nine of those states. *Id.* at 172. This, according to the court, was "far from the three-quarters of the States that had statutes authorizing the warrantless inspections upheld in *Burger*," and thus contributed to the Tenth Circuit's conclusion that the kennel industry was not "closely regulated." *Id.* (citing *Burger*, 482 U.S. at 705, 698 n.11).

As the TLC itself boasted in 2015, the Rules are an outlier that are "unmatched by any other jurisdiction." JA22. Thus, the novelty and "unmatched" nature of the

40

City's inspection regime is yet another factor demonstrating that FHVs are not "closely regulated" within the meaning of *Patel*. 576 U.S. at 424-26.

## II. THE RULES ARE UNREASONABLE

### A. The Rules Do Not Constitute A Reasonable Inspection Regime For A Closely Regulated Industry

Even if Wheely operated in a "closely regulated" industry, the Rules would still be unconstitutional because they fail the test for warrantless inspections of "closely regulated" industries. To satisfy that test: (1) "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) the inspections must be "necessary to further the regulatory scheme"; and (3) the statute's inspection program must provide a "constitutionally adequate substitute for a warrant." *Patel*, 576 U.S. at 426.

Here, the City's stated goals in enacting the Rules were to combat driver fatigue and ensure "passenger safety, driver accountability, and consumer protection." SPA35. While those interests may appear "substantial" in the abstract, the City assembled no record that driver fatigue or passenger safety presented a documented problem in the FHV industry. To the contrary, the City acknowledged that "almost all TLC-licensed drivers do not drive an excessive number of hours." JA373. And, indeed, the City's own data likewise shows that fines or hearings involving FHV drivers are exceedingly rare. JA1016.

Regardless, the Rules' sweeping demand for time-stamped, per-trip

41

geolocation records is not "necessary to further" the City's stated interests. Per-trip driver identification data could theoretically help the City issue summonses to drivers involved in crashes or other safety-related incidents, and pickup and drop-off times could theoretically allow the TLC to calculate trip durations, which the City expressly admitted was "a more accurate way to identify drivers at risk of fatigue." JA373. But the City never explained—then or now—why the compelled disclosure of trip-level *location* data is necessary to advance any of its claimed interests.

Indeed, if preventing "fatigued driving" were the goal, that objective is easily accomplished through the collection of shift length or trip length data. Precise geolocation data has nothing to do with it. In fact, given the variability in New York City traffic conditions, pickup and drop-off location data is the *least* accurate way to judge how long a driver may be on the road. And, as explained above, the City has never offered any data, statistics, or even anecdotal evidence that fatigued driving is an issue for the New York FHV drivers. This is dispositive. *See Anobile v. Pelligrino*, 303 F.3d 107, 120 (2d Cir. 2002) (invalidating portion of regulation that was "simply not necessary" for achieving city's stated goal).

Further, although the City has vaguely asserted that location data would help it "develop informed policies," "support street enforcement," and "confirm the accuracy" of other records (JA532; JA565), the City does not explain why precise

42

pickup and drop-off location data is necessary to further those goals. Regardless, such generic rationales are insufficient, as the Fourth Amendment does not permit the government to compel disclosure merely because doing so might make regulation more convenient or efficient. *Patel*, 576 U.S. at 427 (rejecting the government's efficiency rationale for warrantless access to hotel records because the concern that operators might "falsify their records" if given advance notice "could be made regarding any recordkeeping requirement"); *see also Arizona v. Gant*, 556 U.S. 332, 349 (2009) ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."). Indeed, "[s]imply seeking to prevent falsification of records or looking to avoid administrative burdens will not be sufficient to conduct a warrantless search." *Liberty Coins*, 880 F.3d at 285. Because location data is unnecessary to furthering the City's stated interests, the Rules should be invalidated as unreasonable; at the very least, the requirement to turn over trip-level location data should be stricken.

*Anobile v. Pelligrino* demonstrates the point. There, this Court considered a regulation allowing searches of racetrack dormitories, barns, and vehicles. It acknowledged the City's interest in policing use of equine drugs, and held that "searches of the vehicles, barns, and persons located in the racetrack area . . . sufficiently protects the integrity of New York's racing industry." 303 F.3d at 120. But this Court invalidated the portion of the rules authorizing searches of "dormitory

rooms" because they were "simply not necessary" to the stated goals. Here, too, trip-level geolocation data "is simply not necessary" to protect the City's interests. *Id.*

More broadly, the Rules' entire mandatory reporting regime is "not necessary" to the City's stated interests. Warrantless search regimes are necessary if "a warrant requirement could significantly frustrate effective enforcement of the Act." *Donovan v. Dewey*, 452 U.S. 594, 603 (1981).[5] That concern may arise when the objects of the search are easily concealed or altered, or likely to change hands quickly, such that "unannounced, even frequent inspections are essential." *Biswell*, 406 U.S. at 316; *see Donovan*, 452 U.S. at 603 (warrantless searches of mines necessary due to the "notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained"); *Burger*, 482 U.S. at 710 ("stolen cars and parts often pass quickly through an automobile junkyard," so "frequent" and "unannounced" inspections were necessary to detect them); *Owner-Operator*, 840 F.3d at 895 (tracking of commercial trucking hours necessary to combat the "widespread problem" of falsified paper records, including evidence that "motor carriers sometimes pressure [drivers] to alter their paper records").

Trip-level location data has none of those characteristics, particularly where it is retained for ordinary recordkeeping purposes. Pickup and drop-off times, driver

---

[5] Even then, constitutional warrantless inspection regimes entail periodic inspections, not the continuous and automatic surrender of property, as compelled by the Rules.

identification numbers, and vehicle license numbers are historical records that cannot be concealed, altered, or transferred in a manner akin to physical contraband or health hazards. Certainly, the record does not show trip location data being concealed with any regularity. The City therefore has no comparable need for recurring and suspicionless access to every base's records in order to advance its safety and compliance interests. In this context, those interests can be served through administrative subpoenas directed to particular records from particular bases. *See Liberty Coins, LLC*, 880 F.3d at 290 (denying the state unhindered access to metal dealers' books and records because it was "unclear why *warrantless* searches would be required to effectuate" the state's "compliance-based purpose").

The decision in *Owner-Operator* further underscores the point. There, beginning in 1935, the commercial trucking industry required truck drivers to keep paper records showing their driving time, but—"because it is easy to insert an error in paper records, whether intentionally or not"—compliance was a widespread and documented issue. 840 F.3d at 883. As a result, commercial trucks were required to install electronic tracking devices to automatically record "data relevant to the hours of service regulations." *Id.* In upholding this requirement, the court emphasized that the electronic data collected was "intentionally limited in scope," because the devices would "record only at specified times, such as when the vehicle is turned on, when the duty status changes, and once per hour while driving," and "do not pinpoint

45

a vehicle's exact location." *Id.* at 887. Further, the search regime authorized safety officials to review the data only "at roadside inspections and during audits of motor carriers." *Id.*

The record retention regime in *Owner-Operator* serves to highlight the Rules' unreasonable nature. The Rules mandate the bulk and automatic collection of precise, trip-level location data for every single FHV trip performed—month after month, in perpetuity. Far from "intentionally limited," the Rules are overly broad and pull in sensitive passenger data that is untethered to the City's professed interests. As a result, the Rules cannot survive scrutiny under *Burger* and *Anobile*.

## B. The Rules Are Not A Reasonable Administrative Subpoena Scheme

The Rules independently violate the Fourth Amendment under a separate line of Supreme Court authority that applies to all administrative demands for business records. In *See v. City of Seattle*, 387 U.S. 541 (1967), the Supreme Court held that an administrative demand for records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Id.* at 544.

These requirements apply even where the targeted business belongs to a "closely regulated" industry. *See Big Ridge, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 715 F.3d 631, 645 (7th Cir. 2013) (analyzing document requests under *See* even though the targeted mining industry is "closely regulated" under *Donovan v.*

46

*Dewey*). Outside of "closely regulated" industries, an administrative demand must also afford the recipient an opportunity "to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." *Donovan v. Lone Steer*, 464 U.S. 408, 415 (1984).

Applying *See*, Judge Engelmeyer preliminarily enjoined a similar mandatory reporting ordinance as likely unconstitutional in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 491 (S.D.N.Y. 2019). There, the City required that home-sharing services disclose monthly reports for every short-term rental that included (i) the physical address of the short-term unit, (ii) the legal name, address, phone number, and email address of the host, (iii) the number of days the unit was rented, and (iv) the fees collected. *Id.* at 475, 491. Treating the ordinance as the functional equivalent of a recurring monthly subpoena, the court held that the requests were unreasonable due to the "sheer volume of . . . records implicated," "monthly production demand," and "infinite time horizon." *Id*. The court took particular issue with the scope of production, describing it as "breathtaking," "the antithesis of a targeted administrative subpoena for business records," and "devoid of any tailoring." *Id.* at 490-91. Indeed, in calling for "virtually all monthly information the services receive from each user," the ordinance effectively compelled production of "a wholesale replica of [the] booking service's database." *Id.*

47

The Rules here are just as sweeping. Like the ordinance in *Airbnb*, the Rules require the production of FHV bases' entire trip-level history—including precise pickup and drop-off location coordinates, dates, and times—for *every* passenger trip, *every* month. In other words, bases must give the City a replica of their databases of passenger movements, month after month in perpetuity. The Rules also contain no temporal limitation and apply indiscriminately, regardless of any reasonable suspicion that a particular base, passenger, or driver has engaged in unlawful activity. In their indiscriminate breadth, the Rules far exceed the scope of a tailored administrative subpoena.

Nor are the Rules "relevant in purpose," as *See* requires. In *Airbnb*, the court held the City's general enforcement rationales insufficient to justify the regime's sweeping scope. As discussed above (*see* pp. 41-44 *supra*), the City's asserted justifications for the Rules here are similarly generic and cannot justify the Rules' sweeping and recurring demand for time-stamped, trip-level records.

## III. THE RULES DO NOT ALLOW PRECOMPLIANCE REVIEW

Administrative searches of businesses in industries that are not "closely regulated" must give the target "an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420; *Lone Steer*, 464 U.S. at 415 (subpoena must permit the recipient, "before suffering any penalties for refusing to comply with it," to "question the reasonableness of the subpoena" by raising

48

objections in district court). Although *Patel* did not prescribe the precise form such review must take, it made clear that "the searched party must be able to question the search's reasonableness in front of 'a neutral decisionmaker'" and that, at a minimum, "this review must be available 'before [the searched party] faces penalties for failing to comply.'" *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 109 (2d Cir. 2025).

As the term "*pre*compliance" indicates, the required opportunity for review must be available earlier still: before the target must decide "whether or not to comply." *See Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 290 (5th Cir. 2025) ("[P]recompliance encompasses everything before a recipient chooses whether or not to comply."). A regime that provides review only at the penalty stage—*i.e.,* after the recipient has decided not to comply and a violation has been assessed—is not precompliance review at all, and certainly not the kind *Patel* requires. *See id.* (rejecting the state's contention that precompliance review is satisfied by forcing the recipient "to put skin in the game" and "litigate [the] validity [of a demand] in a defensive posture," as incompatible with the Fourth Amendment); *see also Bodin v. City of New Orleans*, 804 F. Supp. 3d 669, 698 (E.D. La. 2025) ("Pre-compliance review means that Airbnb must be able to contest the administrative search by the City before a neutral officer before it has been cited for failure to comply."), *appeal filed*, No. 25-30524 (Sept. 17, 2025); *ESI/Emp. Sols., L.P. v. City of Dallas*, 450 F.

49

Supp. 3d 700, 727 (E.D. Tex. 2020) (holding that a statute permitting an employer to "question the reasonableness of the subpoena" only after receiving a citation for noncompliance was "not the order of events contemplated by the Fourth Amendment").

Here, the Rules do not provide an opportunity for precompliance review. While the district court ruled that *Patel*'s precompliance review requirement was satisfied because affected FHVs could commence a separate legal proceeding under Article 78 of the New York Civil Practice Law and Rules, this was legal error. FHV bases cannot use Article 78 to challenge a monthly demand for trip data "before being forced to choose between handing over their [data] or facing a penalty." *Hudson Shore Assocs.*, 139 F.4th at 111. Under New York law, a party must "exhaust available administrative remedies before being permitted to litigate" through an Article 78 proceeding. *Martinez 2001 v. New York City Campaign Fin. Bd.*, 36 A.D.3d 544, 548 (1st Dep't 2007). Thus, before an FHV base could bring an Article 78 petition to challenge a demand for trip data as-applied to it, it would first need to (i) refuse to comply with a reporting deadline, (ii) receive a summons for violating the Rules, (iii) defend against an enforcement action before the New York City Office of Administrative Trials and Hearings ("OATH"), and (iv) exhaust all administrative appeals.

Indeed, five Uber bases faced this gauntlet after refusing to comply with the

50

Rules in 2014. The TLC issued each base a directive to comply, then a summons to appear before OATH. The OATH hearing officer suspended the bases' licenses and ordered them to pay fines before the bases could even appeal the decision, much less petition for relief under Article 78.[6] Because Article 78 is not available to FHV bases until *after* they have been cited for noncompliance, fined, and suspended, it does not supply the opportunity for *precompliance* review that *Patel* requires.

Article 78 also fails to provide adequate precompliance review for facial challenges to the Rules. While these types of constitutional challenges are exempt from the exhaustion requirement, *see id.* at 549, the mandatory reporting structure of the Rules renders Article 78 unable to provide an opportunity for review "'before [the searched party] faces penalties for failing to comply.'" *Hudson Shore Assocs.*, 139 F.4th at 111.

This Court's decision in *Hudson Shore* is not to the contrary. There, the structure of the inspection regime made clear that landlords could, as a practical matter, obtain Article 78 review "before being forced to choose between handing over their books or facing a penalty." *Id.* Indeed, the records requests were discrete;

---

[6] *Taxi & Limousine Comm'n v. Weiter LLC.*, OATH Summons No. FC0000332 (Jan. 6, 2015), https://www.nyc.gov/assets/oath/downloads/pdf/WeiterNoDecFC0000332.pdf; Jack Linshi, *All But 1 of Uber's NYC Bases Suspended After Failing to Supply Trip Data*, Time (Jan. 6, 2015), https://time.com/3656937/nyc-suspends-uber-bases/.

there was *no deadline* for landlords to comply with any one request; and landlords could challenge each demand through an Article 78 petition "as soon as [it was] made." *Id*. In those circumstances, this Court "decline[d] the Landlords' invitation to speculate about improbable imaginary situations in which a landlord could be penalized for noncompliance before being able to obtain Article 78 review." *Id.* at 111.

Here, by contrast, FHV bases must strictly comply with the Rules' recurring monthly deadlines to produce trip data. And penalties for noncompliance—including fines and license suspensions—are imposed immediately and accrue "for each day past the date the records are due." 35 R.C.N.Y. § 59B-19(a)(3). Thus, unlike in *Hudson Shore*, there is no need to "speculate about improbable imaginary situations in which a [FHV base] could be penalized for noncompliance before being able to obtain Article 78 review." *Hudson Shore Assocs.*, 139 F.4th at 111. Because the reporting demands recur monthly and fines attach automatically upon each missed deadline, it is virtually certain that an FHV base operator will face suspension and penalties for failing to comply with subsequent reporting deadlines while its original Article 78 petition remains pending.

This is precisely why, as one New York appellate court recently concluded, Article 78 is a "toothless" option that fails to satisfy *Patel* when regulatory regimes impose immediate penalties upon a refusal to comply. In *People v. Commons West,*

*LLC*, the New York Appellate Division, Third Department, considered the constitutionality of a state law forcing landlords to consent to governmental searches of their rental properties and records, and imposing penalties for any failure to comply. 254 N.Y.S.3d 276 (3d Dep't Mar. 5, 2026). The state argued that the search regime was constitutional because landlords "have an opportunity to seek precompliance review, in the form of a CPLR article 78 proceeding, prior to facing penalties for failing to comply with a search." *Id.* at 283.

While the court acknowledged that *Hudson Shore* approved article 78 as a valid opportunity under certain regulatory schemes, it held that article 78 fell flat in the face of the regime before it. First, because the state law coerced "blanket consent to search," "the landlord would be left in the untenable position of attempting to challenge in court a search to which he or she had already consented." And second, regulators could impose penalties immediately upon non-compliance, "before a court proceeding has been commenced." *Id.* Based on these deficiencies, the court deemed Article 78 a "toothless" option for precompliance review and enjoined the state law as facially unconstitutional.

The Rules here suffer from the same problems. As in *Commons*, the TLC's search of FHVs occurs automatically as a condition of operating in New York City, meaning that FHVs are left in the same "untenable position" of challenging searches *after* non-compliance. Also as in *Commons*, the TLC imposes fines and penalties

53

immediately upon noncompliance, "before a court proceeding has been commenced." *Id.* In other words, Article 78 is just as "toothless" an option here as it was in *Commons*.

Finally, to hold that Article 78 satisfies precompliance review here would effectively bless any warrantless administrative regime in New York City, since any affected business could theoretically institute a separate Article 78 litigation. Indeed, the district court's holding would permit the government to compel "all online auction services monthly to produce all records of sales by New York City residents," "all medical providers monthly to produce all patient records for care rendered in New York City," and "all credit card companies monthly to produce all records of expenditures in New York restaurants"—so long as Article 78 remains on the books. *Airbnb*, 373 F. Supp. 3d at 495. The abstract, albeit impractical, availability of Article 78 is too slender a reed to support such drastic invasions of privacy.

## IV. THE RULES INDEPENDENTLY VIOLATE ARTICLE I, § 12 OF THE NEW YORK CONSTITUTION

Even had the Rules survived scrutiny under the Fourth Amendment—which they do not—they would independently violate Article I, § 12 of the New York Constitution, which "affords greater protection against warrantless searches than the U.S. Constitution." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009); *see also Airbnb*, 373 F. Supp. 3d at 480 n.5 (same).

54

The New York Court of Appeals has "not hesitated in the past to interpret article I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State's citizens are adequately protected from unreasonable governmental intrusions." *People v. Scott* (*Keta*), 79 N.Y.2d 474, 496-97 (1992). In fact, in *Keta*, the New York Court of Appeals struck down the very same statute—Vehicle and Traffic Law § 415-a(5)(a)—that the United States Supreme Court had previously upheld in *New York v. Burger*, 482 U.S. 691 (1987). *Keta*, 79 N.Y.2d at 495, 497. The New York Court of Appeals expressly "decline[d] to accept" the "principles and standards set forth in *New York v. Burger*" as "controlling in interpreting our own constitutional guarantees," reasoning that the federal standards "do not adequately serve" the "basic privacy values embodied in our Constitution." *Id.* at 498.

Thus, the New York Constitution requires an even higher showing of close regulation to "permit an exception to the warrant and probable cause requirements" than the Fourth Amendment demands. *Id.* at 499. And the Court of Appeals has explicitly held that the mere existence of a licensing and recordkeeping regime does not render an industry "closely regulated" for purposes of the warrantless search exception. *Id*. As demonstrated in Section I.B above, FHV-specific regulations amount to a hodgepodge of "relatively nonintrusive obligations," many of which serve simply to distinguish FHVs from taxis.

Moreover, New York's Article I, § 12 imposes an analytical requirement that is absent from federal closely-regulated-industry doctrine: Courts must not only determine that an industry is pervasively regulated, but also find that the regulatory scheme is not merely a pretext "to give the police an expedient means of enforcing penal sanctions." *Id.* at 498. Here, the existing record raises serious pretext concerns. The City has defended the Rules by gesturing to vague "enforcement" and "safety" rationales, but it has not identified a single administrative problem that the Rules' bulk geolocation collection is designed to address. As explained above in Section I.A, the City has not shown that fatigued driving is a problem in the New York FHV industry. *See id.*, 79 N.Y.2d at 500 (requiring "real administrative violations that could be uncovered in a search").

Meanwhile, the record raises troubling questions about penal motivations behind the Rules. It shows that, since 2015, the TLC has disclosed trip data to other government authorities on 42 separate occasions—13 times without any subpoena or warrant. JA366. Plaintiffs sought to understand the nature of these disclosures through targeted interrogatories, asking the City to identify the requesting entity and the nature of the request. JA515-JA516. While the district court granted a motion to compel the City to answer these interrogatories, it quickly mooted that obligation by dismissing the case. The City objected on grounds of burden, relevance, and privilege—and then invoked, tellingly, NYCPL §§ 160.50 and 160.55 (the criminal

records sealing statutes) as a basis for withholding the information. JA515-JA517. The invocation of criminal records sealing statutes in response to an interrogatory about administrative data disclosures strongly suggests that the data collected under the Rules has in fact been disclosed for criminal enforcement purposes. As a result, the record reflects (despite Plaintiffs being deprived of the opportunity to definitively establish) that the Rules may be a pretext "to give the police an expedient means of enforcing penal sanctions." *Id.* at 498.

The amicus brief filed below by the Surveillance Technology Oversight Project ("STOP") underscored these concerns, highlighting the TLC's integration with the NYPD's broader surveillance systems. When a nominally regulatory data-collection regime feeds directly into criminal surveillance infrastructure, it ceases to be an "administrative" program and becomes the kind of pretextual scheme that Article I, § 12 forbids. Thus, at a minimum, this Court should remand for discovery into (i) the identity of the governmental entities that have received trip data; (ii) whether any such disclosures were made for criminal enforcement purposes; and (iii) the extent of the TLC's integration with the NYPD and other law enforcement agencies.[7]

---

[7] Discovery on these topics may also be relevant to Plaintiffs' claims under the Fourth Amendment to the U.S. Constitution. When a search is made for purposes other than "inventory or administrative regulation," the administrative-search exception to the warrant requirement does not apply. *Anobile*, 303 F.3d at 122. Thus, for example, an administrative search is not lawful if it is a "pretext for

In sum, Article I, § 12 demands more than the Fourth Amendment, and the City has offered less. It has not established that the FHV industry is pervasively regulated under the New York Constitution. It has not identified "real administrative violations" that the Rules' bulk geolocation collection is designed to uncover. And it has refused to disclose whether the data it collects flows to criminal law enforcement. For these reasons, even had the Rules passed muster under the Fourth Amendment, they could not stand under the New York Constitution.

## V. PLAINTIFFS HAVE SATISFIED THE OTHER INJUNCTION FACTORS

"The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Because Wheely has established actual success on the merits of its constitutional claims—and so a constitutional violation—it has demonstrated irreparable harm warranting permanent injunctive relief. *See Allen v. Koenigsmann*, 700 F. Supp. 3d 110, 141

---

obtaining evidence of general criminal activity." *Id.* (citing *Burger*, 482 U.S. at 716-17 n.27). If discovery reveals that law enforcement may freely access trip data produced pursuant to the Rules, then the Rules should be invalidated for violating the warrant requirement. *See Gem Fin. Service, Inc. v. City of New York*, No. 13-CV-1686, 2023 WL 4850523, at *9 (E.D.N.Y. July 28, 2023) (reasonable jury could have found based on evidence that City's searches of proprietary records "were for purposes other than inventory or administrative regulation: namely, to induce plaintiff to rejoin the LeadsOnline program"); *Airbnb*, 373 F. Supp. 3d at 487 n.9 (leaving for discovery whether "municipal prosecutors and criminal investigators" may access the materials produced pursuant to the Ordinance).

(S.D.N.Y. 2023) (a "constitutional violation meets the standard of irreparable harm" for purposes of granting a permanent injunction). Likewise, once a constitutional violation has been established, the balance of equities and public interest weigh decisively in favor of a permanent injunction because the City does "not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).

## CONCLUSION

For the foregoing reasons, the district court's order dismissing Plaintiffs' claims under the Fourth Amendment of the U.S. Constitution and Article I, § 12 of the New York Constitution should be reversed and the case should be remanded with instructions to enter judgment in Plaintiffs' favor.

Dated: New York, New York
      June 25, 2026

                        */s/ Boris Bershteyn*
                        Boris Bershteyn
                        Alexander C. Drylewski
                        Lara A. Flath
                        Jacob G. Lefkowitz
                        SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM LLP
                        One Manhattan West
                        New York, NY 10001
                        Telephone: (212) 735-3000
                        Alexander.Drylewski@skadden.com
                        Lara.Flath@skadden.com
                        Jacob.Lefkowitz@skadden.com

                        *Counsel for Plaintiffs-Appellants*
                        *Wheely USA, Inc., Mayfair-NY LLC,*
                        *and Kensington-NY LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

2.      This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 13,786 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Dated: New York, New York
June 25, 2026

*/s/ Boris Bershteyn*
Boris Bershteyn
Alexander C. Drylewski
Lara A. Flath
Jacob G. Lefkowitz
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Alexander.Drylewski@skadden.com
Lara.Flath@skadden.com
Jacob.Lefkowitz@skadden.com

*Counsel for Plaintiffs-Appellants*
*Wheely USA, Inc., Mayfair-NY LLC,*
*and Kensington-NY LLC*

61